[851 NYS2d 551]

# NFL Enterprises LLC, Appellant, v Comcast Cable Communications, LLC, Respondent.

First Department, February 26, 2008

## APPEARANCES OF COUNSEL

*Covington & Burling LLP,* New York City (*C. William Phillips* and *Matthew J. Watkins* of counsel), for appellant.

*Davis Polk & Wardwell,* New York City (*Michael P. Carroll* of counsel), for respondent.

## OPINION OF THE COURT

GONZALEZ, J.

The issue before us is whether two written agreements simultaneously executed by the parties in 2004 permit defendant Comcast to restrict distribution of the NFL Network to a sports tier or require it to distribute the NFL Network more broadly on its cable distribution systems. Contrary to the motion court's finding, we conclude that the agreements are ambiguous with respect to the scope of the tiering provision and that neither party has established a definitive interpretation as a matter of law. Accordingly, the motion court's holding that the agreements unambiguously permit Comcast to tier the NFL Network is reversed, and summary judgment is denied to both parties.

The National Football League owns the right to broadcast live professional football games on television. NFL Enterprises LLC, a separately existing affiliate of the League, owns and operates a television programming service known as the NFL Network, which offers football-related programming. Defendant Comcast Cable Communications, LLC, owns and operates the largest cable television distribution system in the country, by which it distributes the networks of programmers such as ABC, CBS, NBC, CNN and ESPN. In addition, Comcast owns some of the networks carried on its cable systems, such as the Outdoor Life Network (now called Versus), which also carries sports programming.

In 2004, NFL Enterprises approached Comcast for the purpose of negotiating an agreement to have Comcast distribute the NFL Network on its cable systems. Comcast, in turn, was interested in obtaining a license to broadcast a package of NFL games on one of its own networks. Their discussions resulted in the two agreements that underlie this appeal, the "Out-of-Market Package Letter of Understanding" (the Negotiation Agreement), and the "NFL Network Affiliation Letter Agree-

ment" (the Affiliation Agreement). The Negotiation Agreement, executed on August 11, 2004, states in pertinent part:

> "The points below reflect our understanding of the terms and conditions governing negotiation of the carriage of (a) a package of live, out-of-market, NFL games ('Out-of-Market Package') and (b) a package of live, nationally-telecast NFL games ('Additional Cable Package') *by Comcast . . .*

> "1. During the period commencing on the date of execution of the Letter Agreement and continuing through October 31, 2004 (the 'Negotiating Period'), the parties shall engage in good faith negotiations relating to carriage of an Out-of-Market Package and Additional Cable Package during the 2006 and subsequent [NFL] seasons" (emphasis added).

It is not disputed by the parties that the obligation to negotiate over an "Additional Cable Package" was limited to carrying such a package of NFL games on a Comcast-owned network, not the NFL Network. In fact, the parties negotiated for several months over the possibility of granting Comcast a direct license to telecast NFL games on one of its own networks, but they were ultimately unsuccessful.

The Affiliation Agreement, also executed on August 11, 2004, granted Comcast a nonexclusive right to distribute the NFL Network on its cable systems. In addition, paragraph 3 of exhibit A of such agreement granted Comcast a conditional right to place the NFL Network on a sports tier, which has narrower distribution, since only customers who pay an additional fee for that tier will receive those networks. Paragraph 3 states:

> "3. In the event that [Comcast] does not reach an agreement with [NFL Enterprises] concerning carriage of (i) any package of live, out-of-market regular season NFL games (each such package, an 'Out-of Market Package') or (ii) any package of live, nationally-telecast NFL games (each such package, an 'Additional Cable Package') on or before July 31, 2006, then: a. [Comcast] shall not be obligated to distribute the [NFL Network] on D2 (or on a higher-penetrated level of service) on any System, and may distribute the [NFL Network] on any System as part of any tier, package, or level of service (including a Sports Tier) . . . ."

On June 15, 2006, NFL Enterprises made a written offer to Comcast (June 2006 Offer), stating:

> "This letter constitutes an Offer from [NFL Enterprises] to [Comcast] to distribute, as part of the [NFL Network] on a surcharge basis, [NFL Enterprises'] live regular season NFL games package to be telecast by [NFL Enterprises] (the 'Games Programming'). This Offer is made in accordance with paragraph 5 of Exhibit A of the Affiliation Agreement. Capitalized terms used but not defined herein shall have the meaning ascribed to such terms in the Affiliation Agreement.

> "The terms of this Offer are as follows: Beginning with the 2006 NFL regular season, [NFL Enterprises] will make the Games Programming available to [Comcast] for distribution on the [NFL Network]. In consideration for inclusion of the Games Programming in [Comcast's] distribution of the [NFL Network], [Comcast] will pay to [NFL Enterprises] the License Payment plus a surcharge of Fifty-Five cents ($.55) per subscriber . . .

> "Further to the Affiliation Agreement, this offer must be accepted, in writing, within thirty (30) days after receipt of this letter or it will be deemed rejected."

Paragraph 5 of exhibit A of the Affiliation Agreement, to which the above offer refers, addresses the situation where an NFL games package is broadcast on the NFL Network, not a Comcast-owned network. Paragraph 5 states, in part:

> "If [NFL Enterprises] obtains rights to distribute live regular season NFL games on the [NFL Network], [NFL Enterprises] may offer (an 'Offer') to [Comcast], on a surcharge basis, packages of such live regular season NFL games ('Additional Programming'), and [NFL Enterprises] shall offer to [Comcast] any Additional Programming made available to any distributor as part of, or in connection with, the [NFL Network]."

Comcast requested an extension of time in which to respond to the offer, which NFL Enterprises granted until 5:00 P.M. on July 28, 2006. By letter dated July 28, 2006, Comcast accepted the June 2006 Offer (July 2006 Agreement). In its acceptance

letter, Comcast wrote: "As is stated in your July 14, 2006 letter, and as we discussed on July 26th and 27th, all terms, conditions, and definitions included in the Affiliation Agreement (including . . . [Comcast's] right to distribute the [NFL Network] as part of any tier, package, or level of service) remain in full force and effect." In a July 28, 2006 response, NFL Enterprises thanked Comcast for its acceptance and stated that such acceptance did not "otherwise amend any of the terms and conditions of the Affiliation Agreement (including those provisions cited in your letter) as those terms and conditions exist as of the date of the Offer."

In September 2006, Comcast informed NFL Enterprises that it would be launching the NFL Network on a sports tier. NFL Enterprises responded that it did not intend to allow Comcast to do so. Discussions ensued over whether the July 2006 Agreement extinguished Comcast's conditional right to tier the NFL Network under paragraph 3, but no resolution was reached. Accordingly, in October 2006, NFL Enterprises commenced the instant action seeking a judgment declaring that under paragraph 3, Comcast is obligated to distribute the NFL Network to subscribers at a D2 level or higher, and not on a sports tier.

In November 10, 2006, Comcast answered and immediately moved for summary judgment. Comcast argued that the Negotiation and Affiliation Agreements must be read together, since they were executed the same day, included similar language and covered the same subject matter. It further contended that because the Negotiation Agreement clearly requires the parties to negotiate over an "Additional Cable Package" to be broadcast on a Comcast-owned network, and paragraph 3 of exhibit A of the Affiliation Agreement discusses the result if an agreement over an "Additional Cable Package" is not reached, reading these provisions together mandates the conclusion that both the obligation to negotiate and the conditional tiering right relate exclusively to an agreement to broadcast NFL games on a Comcast-owned network. Additionally, Comcast noted that paragraph 5 of exhibit A of the Affiliation Agreement, under which NFL Enterprises' offer was expressly made, relates to a completely different subject—carrying games on the NFL Network—not on a Comcast-owned network.

In December 2006, NFL Enterprises cross-moved for summary judgment, arguing that the July 2006 Agreement satisfies

paragraph 3, thereby extinguishing Comcast's tiering rights. Specifically, NFL Enterprises argued that there is no material distinction between the games packages defined in paragraph 3 and paragraph 5, and that the "Additional Programming" offered to Comcast pursuant to paragraph 5 ("live regular season NFL games" package) satisfies the definition of "Additional Cable Package" in paragraph 3 ("any package of live, nationally-telecast NFL games"). More importantly, NFL Enterprises asserted that, unlike the Negotiation Agreement, paragraph 3 of exhibit A of the Affiliation Agreement (the tiering provision) is not limited by its terms to a package of NFL games broadcast on a Comcast-owned network. Thus, it argued, as long as the parties' agreement satisfies the definition of "Additional Cable Package," the requirements of paragraph 3 are met.

Supreme Court granted Comcast's summary judgment motion and denied NFL Enterprises' cross motion, declaring that "defendant [Comcast] is entitled to distribute the NFL Network on a sports tier, under the agreements between the parties" (15 Misc 3d 1130[A], 2007 NY Slip Op 50920[U], *8). The court found no ambiguity in the agreements, which must be read together, and held that the inclusion of the words, "by Comcast," in the Negotiation Agreement requires that the same limitation be read into paragraph 3 of exhibit A of the Affiliation Agreement. Thus, the failure to reach an agreement for the broadcast of NFL games on a Comcast-owned network preserved Comcast's tiering right under paragraph 3. In addition, the court found that "an agreement under Paragraph 5 is a distinct agreement from an agreement under Paragraph 3," since different terms are used to describe the games packages in each provision and only paragraph 5 is expressly limited by its terms to games telecast on the NFL Network (2007 NY Slip Op 50920[U] at *7).

On appeal, NFL Enterprises argues that the plain language of paragraph 3 prohibits Comcast from placing the NFL Network on a sports tier, because the parties' July 2006 Agreement to distribute a "live regular season NFL games package" on the NFL Network falls within the class of agreements that extinguish Comcast's tiering rights under paragraph 3. It further asserts that, contrary to Supreme Court's holding, paragraph 3 does not require that an "Additional Cable Package" ("any package of live, nationally-telecast NFL games") be carried on a Comcast-owned network, since the limiting terms, "by Comcast," are nowhere to be found in the definition of such pack-

age, or anywhere else in paragraph 3. Finally, NFL Enterprises argues that the games packages under paragraph 3 and paragraph 5 are not mutually exclusive, and that the offer of a package of NFL games under paragraph 5 also meets the requirements of paragraph 3, thereby extinguishing Comcast's tiering rights.

"[A] written agreement that is complete, clear and unambiguous on its face must be enforced according to the plain meaning of its terms" (*Greenfield v Philles Records*, 98 NY2d 562, 569 [2002]). "Extrinsic evidence of the parties' intent may be considered only if the agreement is ambiguous, which is an issue of law for the courts to decide" (*id.*). Although both parties contend that the agreements in this case are unambiguous, we conclude that they are reasonably susceptible to more than one interpretation, rendering summary judgment inappropriate (*LoFrisco v Winston & Strawn LLP*, 42 AD3d 304, 307-308 [2007]). Neither side has established a correct interpretation of the relevant agreements as a matter of law.

An examination of each party's argument is instructive. Comcast's basic position is that the Negotiation and Affiliation Agreements must be read together, and that since the agreements use identical terms in describing the relevant games package ("Additional Cable Package"), and NFL Enterprises has conceded that the obligation to negotiate in the Negotiation Agreement relates exclusively to carrying games on a Comcast-owned network, the Affiliation Agreement must also be read to be so limited.

The problem with this argument is that it ignores the fact that the two agreements are substantively different. While the Negotiation Agreement clearly and unambiguously requires the parties to negotiate in good faith over having an "Out-of-Market Package" or "Additional Cable Package" carried *by Comcast* (i.e., on a Comcast-owned network), paragraph 3 of exhibit A of the Affiliation Agreement includes no such limitation. Paragraph 3 simply says that if the parties do not reach an agreement concerning the carriage of either of those defined packages, then Comcast will have the right to put the NFL Network on a sports tier. Notably, neither the definition of "Additional Cable Package" nor any other provision of paragraph 3 is limited to games broadcast on a Comcast-owned network. Thus, Comcast's argument that an "Additional Cable Package" must be limited to games broadcast on a Comcast-owned network is not supported by the contract's language.

In light of this obvious textual inconsistency, the motion court attempted to read the limitation from one agreement into the other. It relied on the identical language used to describe the games packages in both agreements, as well as the fact that the agreements complement each other by imposing a duty to negotiate over the games packages, on the one hand, and the consequences for the failure to reach an agreement (i.e., tiering), on the other. This was error. By its express terms, the conditional tiering provision of paragraph 3 is not limited to an agreement for a package of NFL games broadcast on a Comcast-owned network, and such a limitation may not be read into the contract under the guise of contract interpretation (*see Reiss v Financial Performance Corp.*, 97 NY2d 195, 199 [2001] ["courts may not by construction add or excise terms, nor distort the meaning of those used and thereby make a new contract for the parties under the guise of interpreting the writing" (internal quotation marks and citation omitted)]).

Declining to adopt the court's implied-limitation analysis, Comcast makes a different argument. Indeed, recognizing that only one of the agreements includes the limiting phrase, "by Comcast," it seeks to downplay the effect of such phrase by arguing that it is merely "introductory" and is not a substantive part of the duty to negotiate found in paragraph 1 of the Negotiation Agreement. According to Comcast, because the phrase, "by Comcast," is not a substantive part of the Negotiation Agreement, it cannot be a basis for reading the two identically worded agreements differently in scope.

Oddly, Comcast goes so far as to assert that the phrase, "by Comcast," in the introductory clause of the Negotiation Agreement is not even the source of the limitation of the scope of that agreement. Instead, it offers a strained argument that the source of the limitation restricting the "Additional Cable Package" to games telecast on a Comcast-owned network is the use of the phrase, "nationally-telecast," in the definition of "Additional Cable Package." According to Comcast, this phrase somehow indicates that the games package must be telecast on a Comcast-owned network, and not on the NFL Network.

It is unnecessary for us to examine this argument at length, because, for purposes of this motion for summary judgment, Comcast has failed on the most basic level to demonstrate that paragraph 3 is clearly and unambiguously limited in scope to NFL games telecast on a Comcast-owned network. While the phrase, "nationally-telecast," may imply something to a person

experienced in the television business, it does not expressly, or even facially, limit the relevant packages to those carried exclusively on a Comcast-owned network. Accordingly, Comcast has failed to show as a matter of law that use of the phrase, "by Comcast," in one agreement but not in the other is not a valid basis for reading the agreements differently.

NFL Enterprises' interpretation of the two agreements is likewise flawed. As mentioned, it relies on the absence of the phrase, "by Comcast," in paragraph 3 to conclude that that agreement does not incorporate the limitation regarding games telecast on a Comcast-owned network. While, as discussed above, the absence of the phrase is significant, there are also sufficient similarities between the two agreements to support Comcast's argument that the agreements are coextensive. Indeed, Comcast is correct in asserting that paragraph 1 of the Negotiation Agreement and paragraph 3 of exhibit A of the Affiliation Agreement "fit together hand in glove," in that the former requires negotiation over two types of packages to be telecast by Comcast and the latter declares the consequence for the failure to reach an agreement on identically described packages. Although the Affiliation Agreement omits any reference to broadcasting "by Comcast," a strong argument can be made that the two agreements, executed the same day, describing the same games packages and including complementary provisions imposing a duty to negotiate and consequences for a failure to agree, should be read as coextensive in scope.

Moreover, the differences between paragraph 3 and paragraph 5 also raise questions about NFL Enterprises' interpretation of the agreements. To reiterate, NFL Enterprises contends that its offer to have Comcast distribute a "live regular season NFL games package" on the NFL Network ("Games Programming") not only met the requirements of paragraph 5, but also fit the definition of an "Additional Cable Package" described in paragraph 3 ("any package of live, nationally-telecast NFL games"). However, while the two games packages are certainly similarly worded, there are significant distinctions between an agreement under paragraph 3 and one under paragraph 5. First, it is undisputed that the latter paragraph relates only to a games package that would be telecast on the NFL Network, while paragraph 3 does not mention any particular network. Second, paragraph 5 uses a phrase for the games package—"Additional Programming"—that is similar, yet not identical, to the "Additional Cable Package" in paragraph 3. The use of different

terms in the same agreement strongly implies that the terms are to be accorded different meanings (*see Frank B. Hall & Co. of N.Y. v Orient Overseas Assoc.*, 48 NY2d 958 [1979]). Thus, while NFL Enterprises is probably correct in asserting that the June 2006 Offer technically satisfied the definition of an "Additional Cable Package," the wording of the offer itself, and the fact that it specifically tracked the requirements of paragraph 5, strongly suggest that it was not intended to implicate the tiering provision of paragraph 3. As Comcast notes, it would have been a simple task to incorporate the "Additional Programming" package into paragraph 3, had it been the parties' intention that an agreement on such a package also would extinguish Comcast's tiering rights. The failure to include it supports Comcast's argument that an offer made under paragraph 5 has nothing to do with the tiering right discussed in paragraph 3.

In short, neither party has established that its interpretation of the relevant contracts is correct as a matter of law. Nor does the limited, conflicting parol evidence submitted by the parties eliminate the ambiguity in the agreements (*see Pearson v Parkside Ltd. Liab. Co.*, 44 AD3d 833, 834-835 [2007]). Both parties submitted affidavits from the executives who represented them in the negotiations over the respective agreements, but none of the affidavits definitively establish whether the July 2006 Agreement satisfies the requirements of paragraph 3, thereby extinguishing Comcast's right to tier.

"Where . . . the language of a contract is ambiguous, its construction presents a question of fact which may not be resolved by the court on a motion for summary judgment" (*Pepco Constr. of N.Y., Inc. v CNA Ins. Co.*, 15 AD3d 464, 465 [2005]; *see also LoFrisco*, 42 AD3d at 307-308). While it is not this Court's preference to find a triable issue of fact concerning the terms of a written agreement between two sophisticated contracting parties, our options are limited where the contractual provisions at issue are drafted in a manner that fails to eliminate significant ambiguities and the only extrinsic evidence offered is each party's self-serving statements regarding its own understanding of the agreement.

Accordingly, the order and judgment (one paper) of the Supreme Court, New York County (Bernard Fried, J.), entered May 8, 2007, which granted defendant Comcast's motion for summary judgment and declared that Comcast is entitled to distribute the NFL Network on a sports tier under the agreements between the parties, and denied plaintiff NFL Enterprises' cross

motion for summary judgment, should be modified, on the law, Comcast's motion denied, and otherwise affirmed, without costs, and the matter remanded for further proceedings consistent herewith.

Tom, J.P., NARDELLI and KAVANAGH, JJ., concur.

Order and judgment (one paper), Supreme Court, New York County, entered May 8, 2007, modified, on the law, Comcast's motion denied, and otherwise affirmed, without costs, and the matter remanded for further proceedings consistent herewith.